Chabot v. HHS                     CV-435-SD       06/28/95

UNITED STATES DISTRICT COURT FOR THE

DISTRICT OF NEW HAMPSHIRE


Gloria Chabot

    v.                                          Civil No. 94-435-SD

Secretary of Health and Human Services


O R D E R


    Pursuant to section 205(g) of the Social Security Act, 42
U.S.C. § 405(g), plaintiff Gloria Chabot seeks judicial review of
a final decision of the Secretary of Health and Human Services
which awarded her disability benefits with an onset date of
February 1, 1992.  Plaintiff contends that the onset date of her
disability is July 1987, and she has filed a motion to reverse
and remand the Secretary's decision on that basis.  Defendant has
filed a corresponding motion to affirm the Secretary's onset date
determination.


Background

1.  Education and Work History

    Gloria Chabot was born on November 14, 1952, and currently
resides in Nashua, New Hampshire.  She has nine years of formal
schooling and received a general equivalency diploma (GED) in

1990.  Transcript of Administrative Record (Tr.) 44.

From 1977-1987 plaintiff was employed by the Anheuser-Busch brewery in Merrimack, New Hampshire.  When Chabot started at the company in 1977, she held a number of positions, including lab technician and bottle packer.  Tr. 46.  From 1979 to 1984, she was employed as a soaker discharge operator and was responsible for operating the machine that cleans the bottles.  Tr. 45.  It was in this position that plaintiff alleges she was exposed to the caustic chemicals that precipitated her medical problems, which are identified as reactive airways dysfunction syndrome and asthma.

In 1984 Chabot was transferred to the position of fork truck driver where she remained until July 1987 when she was "walked off her job" by her employer.  Tr. 45, 50.  She received worker's compensation benefits from 1987 until her case was lump-summed in March of 1993.  Tr. 44, 45.

2.  Medical History

   a.  Prior to 1987

The medical evidence indicates that Chabot saw Dr. James Brocoum, an internist, on a regular basis between 1980 and 1984. Brocoum diagnosed Chabot with asthmatic bronchitis and repeatedly indicated that her work environment was contributing to her

2

symptoms.  Tr. 185, 194-96.  However, the results of the pulmonary function tests performed in May 1984 were considered normal.  Tr. 183.  Further, in his office notes dated October 8, 1984, Dr. Brocoum indicated that plaintiff had changed jobs and was feeling much better.  Tr. 195.

### b.  1987

Plaintiff was first seen by Dr. David Christiani, the Director of the Occupational Health Clinic at Massachusetts Respiratory Hospital in July 1987.  At that time, he performed a complete medical history, as well as an occupational history, physical examination, and a complete set of breathing tests.  Tr. 245-50, 254-55, 289-90.  Dr. Christiani's examination revealed wheezing on forced expiration, but pulmonary function test results were within normal limits.  Tr. 290.  Her FEV1 (forced expiratory volume in one second) was 3.12 liters.[1]  Dr. Christiani concluded that plaintiff's history was consistent with reactive airways dysfunction syndrome resulting from exposure to irritants at work.  Id.  He considered her "disabled from working

---

[1]The section 3.02 listing for Chronic Pulmonary Insufficiency requires that a person with chronic obstructive pulmonary disease have an FEV1 equal to or less than the values specified in Table 1 corresponding to the person's height without shoes.  For plaintiff, this would require an FEV1 of 1.25.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02 (1994).

with caustics" and noted that "exposure to other respiratory irritants must be avoided."  Id. (emphasis added).

Plaintiff continued to see Dr. Christiani on a regular basis, at intervals of approximately one to three months.  Tr. 245-88.  In December 1987 he noted that plaintiff had been away from caustic exposure for four months and was feeling much better.  Tr. 252.  Her FEV1 was 2.80.  Id.  He also indicated that plaintiff would like to return to work in a nonexposed area. Id.

c.  1988 through 1990

In March 1988, seven months after plaintiff stopped working at Anheuser-Busch, Dr. Christiani indicated in his notes that plaintiff was increasing her activity level.  He further stated that although plaintiff could not return to the same work environment, she could be retrained for office work.  Tr. 253.

At the request of her worker's compensation carrier, plaintiff underwent a consultative evaluation with Dr. Edward Gaensler, Professor of Surgery and Physiology at Boston University Medical Center.  Tr. 239-42.  His report, dated May 1988, reviews plaintiff's vocational and medical history in detail.  Dr. Gaensler found, upon examination, normal chest motion and percussion, with very occasional squeaks and wheezes

4

of a "very slight nature."  Tr. 240.  He reviewed results of prior lung function studies and noted that they were within normal limits.  Id.  Dr. Gaensler concluded that plaintiff's "attacks and general respiratory problems were exceedingly mild," and that "aside from her sensitivity to various substances used at the [Anheuser-Busch] plant, she could engage in any employment whatsoever."  Tr. 242.  He further stated, "I would join in the opinion of all of the other physicians who have seen her that any future employment should be in a 'clean' environment without exposure to any kind of fumes--a condition that is easily met by office or outdoor employment but is difficult to achieve with many industrial plants."  Id.

In June 1988 Dr. Christiani indicated that plaintiff had not suffered any serious attacks since she left work eleven months earlier, but that she should remain away from caustics.  Tr. 267.  Her FEV1 was 2.45 at that time.  Id.  Plaintiff's visits with Dr. Christiani in September and December 1988 are consistent with her earlier visits.  Tr. 268-69.

In February 1989 Dr. Christiani noted that plaintiff was suffering from cold air bronchospasms.  Tr. 270.  Her FEV1 was 2.39 at that time.  Tr. 270.  During a visit in May 1989 Dr. Christiani noted that plaintiff had experienced no recent exacerbations and had not required any emergency room visits

since leaving work. Tr. 271. The doctor again stated that plaintiff may work in a clean environment only. Id.

In March 1990 Dr. Christiani noted that Beclovent was added to plaintiff's medication regimen in response to an increase in symptoms. Tr. 274. He further noted that plaintiff was "doing worse this winter." Id. Her FEV1 was 2.40. Id. Dr. Christiani saw plaintiff again in April 1990 and noted that she was doing better but still needed the inhaler frequently. Tr. 275. This improvement was reflected in the FEV1 level of 2.48. Id.

In June 1990 Dr. Christiani noted that plaintiff did have an attack since her last visit but that she was doing reasonably well. Tr. 276. He further noted that she had frequent "wheeze episodes" which were controlled by the inhaler. Id.

In July 1990 Dr. Christiani indicated that during the previous two months plaintiff had suffered several episodes which were controlled with medications. Tr. 277. Dr. Christiani's notes also indicate that plaintiff informed him of an offer to be retrained as an ultrasound technician. Id. Dr. Christiani also mentions this possible return to work in a letter dated July 10, 1990, in which he states, "I believe this is excellent and that you are medically fit to perform such a job." Tr. 292.

Dr. Christiani's subsequent office notes for September, November, and December 1990 indicate an increase in the severity

6

of plaintiff's condition.  The doctor noted that plaintiff was having an increase in her symptoms, including "trouble sleeping with cough, wheeze, and SOB [shortness of breath]."  Tr. 279.  By November, plaintiff's FEV1 had reached a low of 1.91, and a nebulizer was prescribed in an attempt to control her symptoms.  Tr. 279-80.  At this time plaintiff was using a portable peak flow meter at home to monitor the "exacerbations".  Tr. 278.

The medical evidence also contains a number of letters from Dr. John Wang, a specialist in internal medicine and cardiology.  Tr. 211-16.  These letters indicate that plaintiff was under Dr. Wang's care between 1988 and 1990.  Tr. 215.  Dr. Wang's letters, which are not accompanied by any office notes or test results, indicate that plaintiff is "totally incapacitated from work because of hyper-reactive airways disease," Tr. 211, and that plaintiff is "unable for medical reasons to perform the functions of any occupation for which she [is] reasonably qualified by reason of education, training and experience," Tr. 212.  In October 1988 Dr. Wang stated that plaintiff is "totally incapacitated from work activities at her work at Anheuser Busch."  Tr. 213.

In a letter dated February 15, 1990, Dr. Wang stated that plaintiff "has been suffering from a respiratory distress syndrome which has been work related and has deteriorated

7

progressively over the last five years. . . . She has permanent damage to her respiratory system, and will remain disabled for the foreseeable future." Tr. 215. Once again, Dr. Wang's letter is not supported with any medical reports or other data.

In April 1990 plaintiff underwent a second consultative examination at the request of her worker's compensation carrier. Tr. 243-44. Dr. Frank Davidson of Northeast Medical Evaluations noted that the results of the pulmonary function tests he reviewed were normal or near normal. Tr. 243. Physical examination of the chest was negative except for "faint scattered expiratory wheezes consistent with mild asthma or chronic obstructive disease." Tr. 244. Dr. Davidson indicated that, in his opinion, plaintiff could not return to her job at Anheuser-Busch. He further noted that he agreed with the consultant opinions that plaintiff "should work in an environment free of any fumes, i.e. in an office or outside." Id. Dr. Davidson concluded that "[b]ecause of her normal pulmonary function tests in the past, I do not believe there is any permanent loss of breathing capacity." Id.

d. 1991 to 1992

In March 1991 Dr. Christiani noted that plaintiff's exacerbations had been less severe since starting the nebulizer

8

but that cold air made her symptoms worse.  Tr. 281.  The doctor's notes contain no record of visits between March 1991 and July 1992, at which time it was noted that plaintiff's FEV1 had decreased to 1.04.  Tr. 285.

A consultative evaluation was performed by Dr. Peter Corrigan in October 1992.  Tr. 221-24.  Dr. Corrigan agreed that plaintiff would have to work in a clean environment.  Tr. 223. He stated that plaintiff "should not be exposed to any work environment where she will be near any smells or chemicals which would act as an irritant and make her breathing worse.  The exact nature or description of these irritants is impossible to determine and need to be done on a trial basis."  Tr. 224.

In December 1992 Dr. Wang indicated in a letter that plaintiff "was unable to hold any gainful employment on a continuing basis as of August 1987, and was certainly totally disabled as of June 1990."  Tr. 216.


3.  Procedural History

Plaintiff filed her application for disability benefits on April 7, 1992, alleging July 13, 1987, as the onset date of her permanent disability.  Tr. 80-81.

On November 18, 1992, plaintiff was awarded disability benefits with an established onset date of February 1, 1992.  Tr.

84. Plaintiff filed a request for reconsideration of the onset date determination, Tr. 94, but on March 17, 1993, the Secretary affirmed the established onset date of February 1, 1992, Tr. 97-100.

Plaintiff timely filed a request for hearing before an Administrative Law Judge (ALJ). Such hearing was held on October 7, 1993, and plaintiff appeared with counsel. Tr. 19. In an order dated February 23, 1994, the ALJ found that the "claimant has not been under a 'disability', as defined in the Act, at any time from July 13, 1987 through January 31, 1992 but became disabled as of February 1, 1992 . . . ." Tr. 24. Specifically, the ALJ found that

> 4. The claimant's testimony and allegations regarding subjective complaints, are not credible as they relate to disability prior to February 1, 1992.
> 5. Until February 1, 1992 the claimant had the residual functional capacity to perform the exertional and nonexertional requirements of light and sedentary work except for walking for prolonged periods of time, working in cold temperatures and being exposed to excessive amounts of dust, fumes and odors (20 CFR 404.1545).
> . . . .
> 11. Based on an exertional capacity for the full range of light and sedentary work and the claimant's age, education and work experience, Section 404.1569 and Rules 202.20 and 201.27 of Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled" during the period July 13, 1987 until February 1, 1992 unless the range of work was significantly compromised.

10

12. Although the claimant's limitations during the period July 13, 1987 until February 1, 1992 did not allow her to perform the full range of either light or sedentary work, using the above-cited rules as a framework for decision-making there was a significant number of jobs in the national economy which she could perform. Examples of such jobs are as a cashier, an office clerk and an electronics assembler. These jobs exist in the national economy in numbers of over 1.75 million.

Tr. 23-24. On June 27, 1994, the Appeals Council denied plaintiff's request for review, thereby rendering the ALJ's decision final. Tr. 5-6. The instant appeal followed, and plaintiff now seeks reversal of the Secretary's decision on the ground that the Secretary's onset date determination is not supported by substantial evidence. Plaintiff also asserts that her case should be remanded so that the ALJ can consider additional evidence from Dr. Christiani.

Discussion

1. Standard of Review

Pursuant to 42 U.S.C. § 405(g), the court is empowered to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g) (Supp. 1995). However, the court's review of the Secretary's decision is a limited one. When reviewing a

11

Social Security disability determination, the factual findings of the Secretary "shall be conclusive if supported by 'substantial evidence.'" Irlanda Ortiz v. Secretary, 955 F.2d 765, 769 (1st Cir. 1991) (quoting 42 U.S.C. § 405(g)).

The Supreme Court has instructed that the term "substantial evidence" means "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Further, substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620 (1966) (citing NLRB v. Nevada Consol. Copper Corp., 316 U.S. 105, 106 (1942)).

Thus, the decision of the Secretary must be affirmed "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Rodriquez Pagan v. Secretary, 819 F.2d 1, 3 (1st Cir. 1987), cert. denied, 484 U.S. 1012 (1988) (citing Lizotte v. Secretary, 654 F.2d 127, 128 (1st Cir. 1981)). See also Irlanda Ortiz, supra, 955 F.2d at 769 (the court "'must uphold the Secretary's findings . . . if a

12

reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion'" (quoting Rodriguez v. Secretary, 647 F.2d 218, 222 (1st Cir. 1981)).

It is incumbent on the Secretary "to determine issues of credibility and to draw inferences from the record evidence." Irlanda Ortiz, supra, 955 F.2d at 769 (citing Rodriguez, supra, 647 F.2d at 222). Moreover, "the resolution of conflicts in the evidence is for the Secretary, not the courts." Id.; see also Evangelista v. Secretary, 826 F.2d 136, 141 (1st Cir. 1987) ("Conflicts in the evidence are, assuredly, for the Secretary-- rather than the courts--to resolve.").


2.  Establishment of Disability Onset Date

Since the inception of her disability claim, plaintiff has maintained that July 1987 is the appropriate onset date for her permanent disability status. The ALJ, however, after reviewing the administrative record and receiving testimony from the plaintiff and an impartial vocational expert (VE), concluded that February 1, 1992, was the onset date of plaintiff's disability.

Disability is defined under the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has

13

lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  More specifically, the Act provides that an individual

> shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (emphasis added).

In light of this legislative mandate, the Secretary has established a five-step sequential evaluation process for evaluating whether a disability claimant's medical impairment precludes her from engaging in "substantial gainful activity." See 20 C.F.R. § 404.1520(b)-(f) (1994); see also Yuckert, supra, 482 U.S. at 140-42; Goodermote v. Secretary, 690 F.2d 5, 6 (1st Cir. 1982).[2]

---

[2]Applying this five-step sequential analysis, the Secretary is required to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; (5) whether the impairment prevents the claimant from doing any other work.  20 C.F.R. § 404.1520.

The claimant has the burden of proof as to the first four steps in the sequential analysis. However, once the claimant establishes, at step four, that her impairment prevents her from doing her past relevant work, the burden then shifts to the Secretary to prove that other work is available in the national economy which the claimant could do. See Dudley v. Secretary, 816 F.2d 792, 793 (1st Cir. 1987) (per curiam) (citing Goodermote, supra, 690 F.2d at 6-7).

Here, Chabot met her burden of proving that her impairment prevents her from doing any of her past relevant work at the Anheuser-Busch plant. At step five, the Secretary found that prior to February 1, 1992, plaintiff "had the residual functional capacity to perform the exertional and nonexertional requirements of light and sedentary work except for walking for prolonged periods of time, working in cold temperatures and being exposed to excessive amounts of dust, fumes and odors." Tr. 23. The Secretary further found that despite plaintiff's limitations there were a significant number of jobs in the national economy which she could perform, including those of a cashier, an office clerk, and an electronics assembler. Tr. 24.

## 3. The Step-Five Analysis

Plaintiff asserts that the Secretary's onset date

determination is not supported by substantial evidence in that (1) the hypothetical posed by the ALJ to the VE did not include all of the plaintiff's environmental restrictions; (2) the jobs identified by the VE require a worker's contact with airborne pollutants which plaintiff's reactive airways disease cannot tolerate, and further require frequent walking or standing which plaintiff cannot do; and (3) the ALJ made no downward adjustments to the number of jobs identified by the VE in light of plaintiff's environmental restrictions.

### a. Plaintiff's Environmental Restrictions

Plaintiff contends that the ALJ's findings at Step 5 are not supported by substantial evidence because the hypotheticals posed by the ALJ to the VE did not include all of plaintiff's environmental restrictions.

The ALJ's hypothetical questions included someone who

> would be best suited to work in a job where
> they didn't have to do a great deal of
> walking, that is prolonged walking . . . [and
> who] would be best suited to work where they
> wouldn't be perhaps working outdoors where it
> is cold or even indoors where it was cold and
> certainly wouldn't be able to work around
> what would be considered excessive amounts of
> dust and fumes and odors and, and chemicals .
> . . .

Tr. 70-71. Plaintiff challenges this hypothetical because it does not take into consideration that plaintiff's "asthma often

16

requires emergency interventions every 4 to 6 weeks since she is exquisitely sensitive to cold air, any airborne irritants, tobacco smoke, perfumes and room fresheners." Plaintiff's Memorandum at 12.

The additional environmental restrictions identified by plaintiff are those listed in Dr. Christiani's letter of June 1, 1994. As set forth in section 4 of this order, said letter addresses plaintiff's current medical condition rather than her condition during the 1987-1992 time period relevant here. The ALJ was not required to consider plaintiff's current sensitivity to "airborne irritants such as environmental tobacco smoke, off gassing from construction materials, perfumes and room fresheners," Tr. 9, unless she was also subject to such restrictions during the relevant time period.

On this point, the court's review of the medical evidence reveals that from 1987 to 1992, Dr. Christiani indicated that plaintiff should stay away from "caustics" and other "respiratory irritants", Tr. 290, but that plaintiff could return to work in an office environment. Tr. 253. Dr. Christiani also indicated that plaintiff, who had received an offer to be retrained as an ultrasound technician, was "medically fit to perform such a job." Tr. 292.

Similarly, Dr. Gaensler opined that plaintiff's "future

17

employment should be in a 'clean' environment without exposure to any kind of fumes - a condition that is easily met by office or outdoor employment but is difficult to achieve within many industrial plants."  Tr. 242.

Dr. Davidson's evaluation of plaintiff is consistent with the medical findings of Drs. Christiani and Gaensler on the need for plaintiff to work in a clean environment.  Tr. 244.

The only medical evidence that arguably conflicts with the opinions of Drs. Christiani, Gaensler, and Davidson is the opinions of Dr. Wang that plaintiff "was unable to hold any gainful employment on a continuing basis as of August 1987, and was certainly totally disabled as of June 1990."  Tr. 216.

The resolution of conflicts in the evidence such as that between the opinion of Dr. Wang and the opinions of Drs. Christiani, Gaensler, and Davidson, "is for the Secretary, not the courts."  Irlanda Ortiz, supra, 955 F.2d at 769.  In light of the deference given to the Secretary's resolution of conflicts in the evidence, the court finds the ALJ's hypotheticals properly addressed the environmental restrictions to which plaintiff was subject during the 1987-1992 time period.

### b.  Jobs Identified by the VE

In response to the hypothetical described above in section

18

3.a. of this order, the VE testified that an individual with such limitations could possibly perform general office positions and clerical work, some cashier and sales clerk positions, and small products assembly positions in the electronics area. Tr. 71. The VE also provided specific information on the number of such jobs in New Hampshire and in the national economy. Tr. 71-73.

Plaintiff contends that the jobs identified by the VE require contact with airborne pollutants which plaintiff cannot tolerate.

The VE's testimony clearly indicates that, in coming up with jobs plaintiff could perform, she excluded jobs with the following characteristics: "[w]et, cold, exposure to fumes, toxic substances, any atmospheric conditions that may impact on a person's ability to breathe . . . ." Tr. 75. In response to questioning by plaintiff's counsel, the VE further testified that if plaintiff has a sensitivity to fragrances or scents found in products such as perfumes and deodorants, she would be unable to perform the jobs identified by the VE since such jobs all involve interaction with co-workers or the public.

However, as set forth in section 3.a. of this order, during the time period in question, plaintiff's treating physicians agreed that plaintiff could return to work in a "clean" environment, such as an office. The jobs identified by the VE in

19

light of the environmental restrictions contained in the ALJ's hypothetical are precisely the type of "clean" environment jobs plaintiff's physicians felt would be appropriate for her at the time.[3]

Finally, plaintiff asserts that all the jobs identified by the VE as suitable for someone with plaintiff's restrictions are light jobs which require frequent walking or standing and are therefore inappropriate for plaintiff.

"Light work" is defined in the Social Security regulations as work that involves

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b) (1994) (emphasis added).

A plain reading of this regulation shows that not all "light work" requires frequent walking or standing. Further, the jobs

---

[3]Once again, although the evidence supports a finding that plaintiff is currently sensitive to airborne irritants such as tobacco smoke, perfumes, and room fresheners, see Tr. 9, there is no evidence to suggest that plaintiff could not tolerate exposure to such substances during the time period at issue here.

identified by the VE are light jobs that the VE felt someone <u>with</u> plaintiff's limitations, including the inability "to do a great deal of walking," Tr. 70, could perform.  Moreover, the VE also testified that there are cashier and clerk jobs at the sedentary level which plaintiff could perform.

Accordingly, the court finds that the ALJ's acceptance of the jobs identified by the VE as appropriate for plaintiff is supported by substantial evidence.


### c.  Failure to Adjust Numbers

Based on the VE's testimony, the ALJ concluded that the jobs plaintiff could perform "exist in the national economy in numbers over 1.75 million."  Tr. 24.  Plaintiff contends that this conclusion is not supported by substantial evidence because the ALJ "made no adjustment in numbers based on the VE's testimony that these gross numbers had to be adjusted downward due to environmental limitations mentioned in the ALJ's hypothetical." Plaintiff's Memorandum at 11.

The court's review of the VE's testimony before the ALJ reveals that the VE took the plaintiff's environmental restrictions into consideration in evaluating what jobs she could perform <u>and</u> in determining how many of those jobs exist in the national economy.  <u>See</u> Tr. 74-77.  Accordingly, there was no need

for the ALJ to make a further downward adjustment to the numbers provided by the VE.

The court finds that the ALJ's conclusion that more than 1.75 millions jobs which plaintiff could perform existed in the national economy during the relevant time is supported by substantial evidence.

Having reviewed the full record and all of the arguments put forth by plaintiff, the court finds that the ALJ's findings at Step 5 were supported by substantial evidence.  Plaintiff's motion to reverse the Secretary's decision is therefore denied.

4.  Consideration of New Medical Evidence

Plaintiff further argues that the Appeals Council erred in declining to remand her case to the ALJ so new medical evidence about the severity of her breathing disorder could have been considered by the VE.

Under sentence six of section 405(g), the court "may at any time order additional evidence be taken before the Secretary, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g); Evangelista, supra, 826 F.2d at 139.

Additional evidence is sufficiently "new" if it is not

22

cumulative or merely a reinterpretation of information previously presented to the ALJ. <u>Id.</u> at 139-40. Further, "to qualify under the new/material standard, the discovered data must be meaningful --neither pleonastic nor irrelevant to the basis for the earlier decision." <u>Id.</u> In addition, the court must conclude "that the Secretary's decision might reasonably have been different had the new evidence been before him at the time of his decision." <u>Falu v. Secretary</u>, 703 F.2d 24, 27 (1st Cir. 1983) (citation omitted).

The second requirement for remand under sentence six, that of "good cause", is met when the claimant provides a legally sufficient reason for not presenting the new evidence at the prior proceeding. <u>Evangelista</u>, <u>supra</u>, 826 F.2d at 139.

The additional evidence at issue is a letter written by Dr. Christiani regarding the appropriateness of the job possibilities posited by the VE at the administrative hearing. Specifically, with respect to the positions of cashier, officer clerk, and electronics assembler, Dr. Christiani states,

> I would have to say <u>at this time</u>, Mrs. Chabot cannot perform the above duties because her asthma is severe enough to require interventions of approximately once every 4 to 6 weeks, and these interventions are often emergency in nature. She is exquisitely sensitive to cold air and to any airborne irritants, such as environmental tobacco smoke, off gassing from construction materials, perfumes and room fresheners. All of the above can be expected to cause an acute asthma attack which, in her case, can

23

be fatal.

Tr. 9 (emphasis added).

It is clear to the court that this letter, which is dated June 1, 1994, reflects plaintiff's current condition, rather than plaintiff's condition during the time period relevant to this appeal. The court finds that because this additional medical evidence does not relate to the period of disability in question, 1987 through 1992, the evidence is not material for the purposes of determining the onset date of plaintiff's disability. Accordingly, plaintiff's motion to remand this case so that the Secretary can consider this new evidence is denied.

<u>Conclusion</u>

For the reasons set forth herein, the court grants defendant's motion to affirm the decision of the Secretary (document 8) and denies the plaintiff's motion to reverse same (document 9).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

June 28, 1995

cc:  Raymond J. Kelly, Esq.
     David L. Broderick, Esq.

24